USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-5-11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALLEN WIGGINS,

                Petitioner,

          - against -

ROBERT ERCOLE,

                Respondent.

**REPORT AND RECOMMENDATION**

**08 Civ. 3053 (GBD) (RLE)**

**To the HONORABLE GEORGE B. DANIELS, U.S.D.J.:**

## I. INTRODUCTION

Petitioner Allen Wiggins, a New York state prisoner at Green Haven Correctional Facility, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On March 26, 2008, Wiggins filed his Petition with the *Pro Se* Office in this District.

On December 17, 1998, Wiggins was convicted of one count of murder in the first degree. He was initially sentenced to life imprisonment without parole, but was resentenced to an indeterminate sentence of twenty-five years to life. Wiggins contends that his incarceration violates the United States Constitution in that: 1) his conviction was obtained in violation of his right to effective assistance of counsel; 2) the prosecution failed to present legally sufficient evidence to support a first-degree murder conviction; and 3) the Appellate Division violated his constitutional right to notice by introducing an alternate theory of liability. For the reasons set forth below, I recommend that the Petition be **DENIED**.

## II. BACKGROUND

### A. Factual Background

#### 1. The Facts According to the Prosecution

During the Summer of 1995, Allen Wiggins borrowed $2000 from his cousin, Adam Hill. (Mem. in Supp. of Pet., Ex. 5 ("May 21 Tr.") at 2-3.) On October 13, 1995, Hill went to Wiggins's apartment, and told him that he had to kill Tarik Brown to satisfy the debt. (*Id.* at 3.) The men went to Hill's car, where Hill gave Wiggins a gun (*id.*), and Wiggins, Hill, and an associate of Hill's named "Dee" drove around for several hours searching for Brown. (*Id.* at 3-4.) Hill eventually parked down the block from Brown's apartment, and Dee and Wiggins got out of the car and waited for Brown in front of the apartment. (*Id.*) When Brown arrived, Wiggins shot him as he was going into his building. (*Id.* at 4.) Wiggins and Dee then ran back to the car where Hill was waiting, throwing the gun into a garbage can on their way. (*Id.*) Brown died of gunshot wounds to the head, chest, and extremities. (Trial Tr. ("Tr.") at 445-46, 451, 470-71.) All of his wounds were caused by the same nine millimeter gun. (Tr. at 643-44.) After several hours had passed, Hill, Wiggins, and Dee sought the help of Maxine Waiters in retrieving the gun. (May 21 Tr. at 4.) Wiggins knocked on Waiters's window and asked her to do him a favor. (Tr. at 509-10.) She went with the men to the street where the gun had been discarded, and carried the gun from the garbage can to the car. (Tr. at 513.)

#### 2. The Facts According to the Defense

On the night of October 13, 1995, Hill and Dee arrived at Wiggins's apartment and invited him to come downtown with them to meet some girls. (Mem. in Supp. of Pet., Ex. 4 ("April 15 Tr.") at 2-3.) When Wiggins got in the car, Hill gave Dee a nine millimeter gun and gave Wiggins a .380. (*Id.* at 3.) Wiggins asked why he was being given a gun and asked to leave,

but Dee insisted that he stay. (*Id.*) After spending a few hours searching for Brown, Hill drove Wiggins and Dee to the vicinity of Brown's apartment, and Wiggins and Dee got out and waited for Brown. (*Id.* at 4.) Wiggins put the .380 under a car seat that was lying abandoned on the sidewalk. (*Id.* at 10.) When Brown arrived, Dee greeted Brown, and then shot at him when he turned his back. (*Id.* at 4.) Wiggins turned and ran down the block, but heard several more shots being fired while he was running. (*Id.* at 4-5.) When he arrived at the car, he started crying, and Hill and Dee criticized him for failing to take more of a role in the shooting. (*Id.* at 5.)

### 3. The Investigation

From their conversations with Brown's family, police identified Hill as a potential suspect in the murder. (Tr. at 104.) On November 3, 1995, Detective Gerald Carley, one of the detectives investigating the case, was informed that Wiggins was being held at another precinct after having been found in a car that was linked to both Hill and Brown. (Tr. at 106-07, 141.) Detective Carley and Detective Victor Terenzio went to get Wiggins and brought him back to the 42nd Precinct for questioning. (Tr. at 107-09.) Wiggins told Carley and Terenzio that on the night of the murder, Hill had come to his apartment and complained that "something had to be done" about Brown. (Tr. at 111.) Hill introduced Wiggins to Dee, whom Hill had met while incarcerated, and told Wiggins that Dee was going to take care of his problem. (Tr. at 112.) Wiggins also told the detectives that he saw Hill give Dee a wad of hundred-dollar bills (Tr. at 113), and that Hill and Dee had driven off, but they returned to Wiggins's apartment early the next morning and told Wiggins that "the problem was taken care of." (*Id.*) After speaking to Detectives Carley and Terenzio, Wiggins gave the same statement to a stenographer. (Tr. at 186.) The next day, Detective Carley arranged to meet Wiggins to introduce him to Detective Sam Robinson, the lead detective on the case. (Tr. at 116-18.) Wiggins repeated his story from

3

the day before. (Tr. at 119.)

On April 15, 1996, Detective Robinson, convinced that Wiggins knew more about the crime than he had originally revealed, picked up Wiggins's mother, Brenda Wiggins, and brought her to the 42nd Precinct. (Tr. at 291.) Mrs. Wiggins told the detectives that she was under the impression that Wiggins was present at the murder. (Tr. at 147.) Detective Robinson arranged to pick up Wiggins and brought him to the precinct. (Tr. at 289.) After asking Mrs. Wiggins to convince Wiggins "to tell the truth," the detectives allowed Wiggins and his mother to speak privately. (Tr. at 125, 145.) Wiggins then told Detectives Robinson and Carley that he was present during the shooting of Brown. Wiggins was read his *Miranda* rights (Tr. at 126, 297), and proceeded to orally relay the sequence of events described above as "The Facts According to the Defense." He followed that up with a handwritten statement and then gave a videotaped statement in the presence of an assistant district attorney ("ADA"). After the statement was recorded, the ADA insisted that Wiggins be arrested despite Detective Robinson's protests that he felt Wiggins would be more useful as a witness in the case. (Tr. at 342.) The next morning, Detective Robinson spoke with an ADA supervisor and convinced him that Wiggins should be released. (Tr. at 343-44.)

Following up on Wiggins's statement that a girl named Maxine, who lived in the building next to his, had helped retrieve the gun after the shooting, the police identified and interviewed Waiters. (Tr. at 347-48.) Waiters told police that she had retrieved the gun at Wiggins's request (Tr. at 404), and that Wiggins told her that he had shot someone. (Tr. at 559-61.) On May 17, 1995, Waiters agreed to wear a recording device and record a conversation with Wiggins. (Tr. at 552.) Detective Robinson and Detective John Morgan arranged to meet Wiggins, and told him to find Maxine and try to find out her address. (Tr. at 353.) During the course of the recorded

4

conversation, Waiters said, "I thought you shot the guy, not killed him," to which Wiggins responded, "things happen." (Tr. at 526.) Waiters also asked Wiggins what he did with the gun, and Wiggins said, "it's gone." (Tr. at 526-27.)

On May 21, 2006, Detective Robinson contacted Wiggins and arranged to pick him up and bring him to the precinct. (Tr. at 357-58.) Detectives Robinson and Morgan put Wiggins in an interview room and read him his *Miranda* rights. (Tr. at 360.) The detectives told Wiggins that they knew he was lying (Tr. at 431), that they had evidence that he was the shooter (Tr. at 418-19), and that "it would be beneficial to him if he told the truth." (Tr. at 431.) After an hour and a half of questioning, during which Wiggins maintained the truth of his previous statement, Detective Robinson told Wiggins that he was under arrest for the murder of Tarik Brown. (Tr. at 385.) About a minute later, Wiggins confessed to being the shooter. (Tr. at 372, 418.) Wiggins made no written statement, but gave another videotaped statement before Detective Robinson and ADA Chris Booth. (Tr. at 369-70.) In this statement he recounted the version of events summarized above as "The Facts According to the Prosecution." (*See generally* May 21 Transcript.) Police never interviewed Hill or Dee, who had been identified as a man named Fernando Garcia. (Tr. at 414, 416-17.)

**4. The Trial**

At trial, the prosecution presented the testimony of Brown's girlfriend, police who responded to the crime scene, the medical examiner, and forensic analysts. They also offered the testimony of Waiters and Detectives Carley, Terenzio, Robinson, and Morgan. Wiggins's original stenographic statement was entered into evidence and both of his videotaped statements were played for the jury, as well as the recording of his conversation with Waiters. The defense called only one witness, an associate of Wiggins's defense attorney who challenged the

5

prosecution's transcript of the recorded conversation between Waiters and Wiggins.

The defense also attempted to call Hill and Garcia. Hill had told Wiggins's attorney, David Hammer, that if he were given immunity he would testify that Wiggins was not the shooter, and would identify the actual shooter. (Tr. at 687.) The prosecutor and the court refused to offer Hill immunity, and Hill exercised his Fifth Amendment right not to testify. (Tr. at 687-89, 695.) Garcia also exercised this right (Tr. at 750-51), prompting the defense to attempt to call Mark Pryor, who had shared a jail cell with Garcia when Garcia was incarcerated on unrelated charges in April 1996, and who was prepared to testify that Garcia told him that Hill had given Garcia $5000 to murder Brown, that Hill had given Garcia a .45 gun, and that Hill and Garcia had gone looking for Brown. (Tr. at 701-02.) Garcia also told Pryor, who was an acquaintance of the Brown family, that he was not the actual shooter (Tr. at 702), but the defense argued that, when taken in conjunction with another statement where Garcia admitted being present at Brown's shooting, Garcia's statements were sufficiently inculpatory to be introduced. (Tr. at 704-05.) The trial court disagreed, ruling that there was no time reference for Garcia's statements, such that he could have been referring to another incident. (Tr. at 706, 755.)

After all evidence had been presented, the defense moved to dismiss the charge of first-degree murder, which was premised on a murder for hire theory. Hammer argued that while there was discussion of the debt that Wiggins owed Hill, there was no evidence of an agreement between the parties that the debt would be excused if Wiggins killed Brown. (Tr. at 763-67.) The trial court ruled that there was sufficient evidence to put the matter before the jury (Tr. at 768), which found Wiggins guilty on the first-degree murder charge. Despite a presentence memorandum that chronicled Wiggins's troubled childhood, lack of a history of criminal violence, and positive contributions to society, and found that his IQ was on the borderline of

6

mental retardation, the trial court ruled that it had "no other option" than to sentence Wiggins to life imprisonment without parole. (Sentencing Tr. at 18-19.)

## B. Procedural Background

Wiggins appealed his conviction to the Appellate Division, First Department. He raised six issues on direct appeal: 1) there was insufficient evidence presented to support a conviction for first-degree murder; 2) the trial court deprived him of his due process rights when it precluded Pryor's testimony; 3) the trial court violated his constitutional rights by responding to a jury note without notice to counsel and the defendant; 4) because he had just turned eighteen when Tarik Brown was murdered, he was not "more than eighteen years old," as required by the first-degree murder statute; 5) the trial court erroneously believed that it was required to sentence him to life without parole; and 6) the sentence of life without parole was excessive given the absence of aggravating factors and the high number of mitigating factors. The Appellate Division rejected most of Wiggins's arguments, but found that the trial court was erroneous in its ruling that it had no discretion in sentencing Wiggins to life without parole, and remanded the case for resentencing. *People v. Wiggins*, 304 A.D.2d 322 (N.Y. App. Div. 2003). In ruling on Wiggins's legal sufficiency claim, the Appellate Division stated, "The jury could reasonably conclude from this evidence that defendant committed the murder in the expectation that his debt would be forgiven, or at the very least, that he would be given more time to repay the debt." *Id.* at 322-23. Leave to appeal to the New York Court of Appeals was denied on September 16, 2003. *People v. Wiggins*, 100 N.Y.2d 625 (2003).

On remand, Wiggins was again sentenced to life without parole. He appealed the resentencing to the Appellate Division, which reduced the sentence to twenty-five years to life, in the interests of justice. *People v. Wiggins*, 24 A.D.3d 263 (N.Y. App. Div. 2005). Wiggins

7

then filed a motion to vacate his conviction pursuant to N.Y.C.P.L. § 440.10, arguing that his trial counsel, Hammer, was ineffective for failing to consult with an expert on the psychology of confessions, because such an expert would have questioned the reliability of Wiggins's third statement to the police. The trial court denied Wiggins's motion, ruling that expert testimony about false confessions would have been inadmissible at the time of Wiggins's trial, such that Hammer could not have been ineffective for failing to call such an expert. (Decl. in Opp'n to Pet., Ex. 11 ("440.10 Decision").) Leave to appeal this decision to the Appellate Division was denied on March 25, 2008.

### III. DISCUSSION

#### A. Threshold Issues

##### 1. Timeliness

A petitioner must file an application for a writ of habeas corpus within one year of his conviction becoming final. *See* 28 U.S.C. § 2244(d)(1). A conviction becomes final "'when [the] time to seek direct review in the United States Supreme Court by writ of certiorari expire[s],'" that is, ninety days after the final determination by the state court. *Williams v. Artuz*, 237 F.3d 147, 150 (2d Cir. 2001) (quoting *Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir. 1998)). The statute of limitations is tolled while state court relief is pending. 28 U.S.C. § 2244(d)(2); *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000). The tolling period runs from when the post-conviction motion is filed until leave to appeal is denied. *See Rodriguez v. Portuondo*, 2003 WL 22966293 at *1-2 (S.D.N.Y. Dec. 15, 2003); *see also Carey v. Saffold*, 536 U.S. 214, 216 (2002); *Bennett v. Artuz*, 199 F.3d 116, 119 (2d Cir. 1999.) Wiggins's conviction became final on June 23, 2008, ninety days after his leave to appeal to the Appellate Division was denied. As his Petition was filed on March 26, 2008, it is timely.

## 2. Exhaustion

Pursuant to 28 U.S.C. § 2254(b), as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), courts may not grant a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies. *See* 28 § 2254(b)(1)(A); *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997). In order to satisfy substantive exhaustion, a petitioner's claim before the state courts must have been federal or constitutional in nature. Although not an exacting standard, a petitioner must inform state courts of "both the factual and legal premises of the claim [he] asserts in federal court." *Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997) (quoting *Daye v. Attorney Gen. of New York*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*)).

> [T]he ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye*, 696 F.2d at 194. Procedurally, the petitioner must utilize all avenues of appellate review within the state court system before proceeding to federal court. *See Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994). He must raise each federal claim at each level of the state court system, "present[ing] the substance of his federal claims 'to the highest court of the pertinent state.'" *Id.* (quoting *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990)). Even where a respondent does not challenge petitioner's claims on exhaustion grounds, the court has an independent obligation to ensure that this requirement has been met, unless expressly waived by the State. *See* 28 U.S.C. § 2254(b)(3). Wiggins raised all of the claims that he now presents during either his direct appeals process or in the process of bringing his § 440.10 motion and raised all of his claims in

9

constitutional terms. They were presented to the highest state court and are both procedurally and substantively exhausted.

## B. Merits of Wiggins's Claims

### 1. Standard of Review

AEDPA constrains a federal habeas court's ability to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. The Act limits issuance of the writ to circumstances in which the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); see *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is contrary to federal law if the state court applies "a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. Furthermore, in cases where the state court decision rests on a factual determination, the federal court must find that the "decision . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

### 2. Wiggins's Claim That His Trial Counsel Was Ineffective

#### a. Legal Standard

A defendant has a Sixth Amendment right to effective counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). This right extends to a first appeal as of right. *Douglas v. California*, 372 U.S. 353 (1963). To establish a violation of that right, a defendant must show that (1) counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and (2) "there is a reasonable probability that but for

counsel's unprofessional errors, the result of the proceeding would have been different," therefore prejudicing him. *Strickland*, 466 U.S. at 689, 697. The first criterion requires a showing that counsel's errors were "so serious that he was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment," and the second requires a showing that counsel's errors so undermined the adversarial process that it deprived the defendant of a fair trial whose result is reliable. *Id.* at 687.

"Under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Instead, the court must find "that the trial court applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id.* In reviewing the ineffective assistance of counsel claim, the court strongly presumes that counsel rendered adequate assistance in making significant decisions in the exercise of reasonable professional judgment. *Id.* at 718; *see also United States v. Cronic*, 466 U.S. 648, 658 (1984). Therefore, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

b. Wiggins's Claim

Wiggins argues that his trial counsel, Hammer, was ineffective for failing to consult with, and call, an expert on the psychology of confessions. In support of this proposition, Wiggins offers an affidavit from Dr. Solomon Fulero, a psychologist and attorney who has testified as an expert in the psychology of interrogations and confessions around the country, including in New York. (Mem. in Supp. of Pet., Ex. 2 ("Fulero Aff.") ¶¶ 1, 4.) Dr. Fulero's affidavit identifies a number of indicators that Wiggins's third statement to the police may have been a false confession, including the tactics used by the detectives (*Id.* ¶ 46), Wiggins's demeanor in the

11

video, the fact that Wiggins frequently looks to Detective Robinson for approval, his lack of detailed responses, his attempts to back away from his statements, and his questions to the ADA about what would result from his statement. (*Id.* ¶ 53.) Dr. Fulero explains that expert testimony would highlight these issues for the jury. (*Id.*) Wiggins also submits an affidavit from Hammer, in which Hammer explains that Wiggins's trial was the first murder trial that he had ever conducted and the first case he had defended where the primary evidence of guilt was the defendant's own statements. (Mem. in Supp. of Pet., Ex. 3 ("Hammer Aff.") ¶ 2.) Hammer also asserts that there was no strategic reason for his failure to consult an expert on false confessions. (*Id.* ¶ 3.)

In response, the State alleges that expert testimony on the psychology of confessions was inadmissible in New York courts at the time of Wiggins's trial, such that Hammer could not have been ineffective for failing to call such an expert. In making this argument, the State relies on *People v. Lea*, 144 A.D.2d 863 (N.Y. App. Div. 1988), a case in which the Appellate Division, Third Department, ruled that a trial court did not err in excluding expert testimony that a defendant's "personality was such that he was deferential to the wishes and attitudes of others, making it more likely that [he] was intimidated by the atmosphere in the interrogation room." *Id.* at 863-64. The State argues that *Lea* would have been binding on the trial court in Wiggins's case, compelling the exclusion of expert testimony regarding the problems in Wiggins's third statement. The trial court deciding Wiggins's § 440.10 motion agreed with the State, ruling that, following *Lea*, expert testimony on the psychology of confessions would have been inadmissible at Wiggins's trial. The § 440 court found that "every reported New York State case, [with one 2005 exception,] rejects false confession testimony." (440.10 Decision, at 13.) Accordingly, it ruled, it would make "little sense to fault trial counsel for failing to offer expert testimony

12

concerning false confessions." (*Id.* at 14.) The § 440 court also found that Hammer generally was highly qualified and provided sound counsel to Wiggins, noting that he did argue during summation that the jury should not find Wiggins's confession to be credible. (*Id.* at 5-7.)

While Wiggins did offer some evidence of unreported cases where expert testimony on false confessions had been admitted, and while the state trial court's ruling did contain some suggestion of a bias against psychological expert testimony, the law on the admissibility of false confession expert testimony was at best unsettled,[1] such that the § 440 court's ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 786-87 (2011). "The standards created by Strickland and [AEDPA] are both 'highly deferential,' and when the two apply in tandem, review is "doubly" so." *Id.* at 788 (internal citations omitted). Additionally, even if it could be said that Hammer's conduct "fell below an objective standard of reasonableness," it has not been established that the prejudice prong of the *Strickland* test has been met. Hammer strenuously argued that Wiggins's third statement was a false confession, but the jury found otherwise. It cannot be said that expert testimony would have created a strong likelihood of a different result. Accordingly, Wiggins's Petition should be **DENIED** on this ground.

### 3. Wiggins's Claim That The Verdict was Legally Insufficient

Wiggins asserts that the prosecution failed to establish the elements of first degree murder, such that the verdict was legally insufficient. A verdict is legally sufficient if, "after

---

[1] It is also unclear whether, even if false confession expert testimony was admissible in New York courts, it would have constituted ineffective assistance of counsel to fail to call such an expert. This is especially true in cases like this one, where counsel made every other effort to question the credibility of the confession.

viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Wiggins argues that there is inadequate evidence to support a murder-for-hire theory because the prosecution's only evidence that he carried out the killing in exchange for the cancellation of his debt to Hill came from his own statements, where he also insisted that he was afraid and that Hill and Dee had made threats against his person and his family, and that Hill had asked him to repay the loan after Brown was shot. The Court agrees with Wiggins that this does not seem to be a standard murder-for-hire case, and that the evidence against him could have been much stronger. Viewing the evidence in the light most favorable to the prosecution, however, the state court was not unreasonable in its ruling that "[t]he jury could reasonably conclude . . . that defendant committed the murder in the expectation that his debt would be forgiven." *Wiggins*, 304 A.D.2d at 322-23. Accordingly, Wiggins's claim on this basis should be **DENIED**.

### 4. Wiggins's Claim That The Appellate Division Violated His Rights By Introducing a New Theory of Liability

In deciding Wiggins's legal insufficiency claim, the Appellate Division held, "[t]he jury could reasonably conclude . . . that defendant committed the murder in the expectation that his debt would be forgiven, or, at the very least, that he would be given more time to repay the debt." Wiggins argues that by referencing a possible extension of time to repay the the debt, the Appellate division introduced a new theory of guilt. He asserts that this violated his constitutional rights in two ways: 1) the Appellate Division deprived him of his right to fair notice of the crimes charged against him; and 2) the Appellate Division substituted its own fact-finding for that of the jury, depriving him of the right to trial by a jury of his peers. The Court

agrees with the State that the Appellate Division's reference to a possible extension of time was *dicta*. Wiggins may be correct that the addition of this line reflects the Appellate Division's recognition that the evidence of first degree murder was not as strong as it could have been, but the Appellate Division did not base its holding on the theory that Wiggins committed the murder in exchange for an extension of his repayment time. Rather, it found that a reasonable jury could have concluded that Wiggins committed the murder in exchange for forgiveness of the loan, and, as discussed above, that holding was not unreasonable. Accordingly, Wiggins's claims based on the Appellate Division's introduction of a new theory of liability should be **DENIED**.

## IV. CONCLUSION

For the reasons set forth above, I recommend that Wiggins's Petition for a writ of habeas corpus be **DENIED**. Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable George B. Daniels, 500 Pearl Street, Room 650, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) West Supp. 1995); FED. R. CIV. P. 72, 6(a), 6(d).

Dated: August 5, 2011
New York, New York

Respectfully Submitted,

*[signature]*

The Honorable Ronald L. Ellis
United States Magistrate Judge

Copies of this Report and Recommendation were sent to:

<u>Attorneys for Petitioner</u>:
Sarah C. Haan and James Q. Walker
Richards Kibbe & Orbe LLP
One World Financial Center
New York, NY 10281

Steven Banks and Lawrence T. Hausman
The Legal Aid Society
199 Water Street
New York, NY 10038
<u>Attorneys for Respondent</u>:
Nancy D. Killian and Thomas R. Villecco
District Attorney, Bronx County
198 East 161st Street
Bronx, NY 10451